C#4L

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| v. | ) | CRIMINAL ACTION |
| | ) | NO. 07-cr-0258-05 |
| GREGORY JONES, a/k/a "G," | ) | |
| Defendant. | ) | |

FILED
JUN 12 2009
MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

## MOTIONS TO SUPPRESS EVIDENCE
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

RUFE, J.                                                                                             June 12, 2009

The Third Superseding Indictment in this matter charges Defendant Gregory Jones with one count of conspiracy to distribute five kilograms or more of cocaine (Count One), and one count of attempted possession with intent to distribute five kilograms or more of cocaine, and aiding and abetting the same (Count Two). Defendant Jones filed a Motion to Suppress [Document No. 261], seeking the suppression of all physical evidence confiscated from a Mullica Hills, New Jersey residence on or about August 27, 2008, as well as Defendant's post-arrest statement of unemployment. Upon consideration of Defendant's Motion, and the evidentiary hearing and oral argument held thereon, the Court enters the following findings of fact and conclusions of law:[1]

### FINDINGS OF FACT

**I.      Locating Defendant Jones in Mullica Hills, New Jersey**

1.      Drug and Enforcement Agency ("DEA") Special Agent Gerald Turner has worked

---

[1] The Court reserves the right to supplement these Findings of Fact and Conclusions of Law after the Notes of Testimony of the Suppression hearing are transcribed.

at the DEA for fourteen years, and is the case agent for this investigation. His supervisor is Special Agent Henry Vinson.

2. An arrest warrant was issued for Defendant Jones on August 20, 2008 pursuant to the Second Superseding Indictment.

3. From an informant, Special Agent Turner discovered that Defendant Jones owned a 2008 Chevy Impala. Special Agent Turner determined that OnStar, a service that provides GPS tracking, could be used to locate Defendant Jones's vehicle. He then obtained a court order for OnStar to track the signal from Defendant Jones's vehicle.

4. On or about August 27, 2008, OnStar traced the signal to Mullica Hills, New Jersey. OnStar's mapping system, however, was not able to direct Special Agent Turner and his team to the exact address, because Defendant Jones resided in a recently constructed housing development.

5. A local police officer from Mullica Hills identified Defendant Jones from photographs shown to him by Special Agent Turner. The municipal officer noted that Defendant Jones drove a red Chevy Impala, revealing that he had recently conducted an investigatory stop of the Defendant. The police officer took Special Agent Turner and his team to a home at 10 Ashford Court, where Defendant Jones was currently residing.

## II. Arrest of Defendant Jones

6. Upon arriving at the Mullica Hills residence, Special Agent Turner went to the front door, while other members of his team stationed themselves at the back and on both sides of the house. Special Agent Turner knocked on the front door and rang the

-2-

doorbell, but there was no response. Simultaneously, members of his team knocked on the side door of the residence.

7. The members of his team stationed at the side door notified Special Agent Turner that the side door was unlocked. Special Agent Turner went to the side door, opened it, and while standing in the doorway, yelled into the house. Special Agent Turner heard voices within the house, but could not make out what they were saying.

8. Special Agent Turner then entered the house through the side doorway, with his gun drawn. At some point, he opened the front door, admitting Special Agent Vinson and other members of his team.

9. When Special Agent Turner reached the foyer on the first floor of the house, the double doors to the master bedroom on the second floor of the house opened, and Defendant Jones emerged with a female companion. Defendant Jones was naked, while his female companion was wearing a T-shirt.

10. Special Agent Turner, with his firearm still drawn, told Defendant Jones that they had a warrant for his arrest and to keep his hands visible. As Special Agent Turner moved up the stairs to detain Defendant Jones, he saw that Defendant Jones was cooperating and holstered his firearm. Special Agent Turner then placed Defendant Jones under arrest, but did not handcuff him at this time to allow him to dress himself.

11. Special Agent Turner and members of his team walked Defendant Jones and his female companion back in to the master bedroom. Upon entering the master bedroom, Special Agent Turner saw in plain view a large book at the foot of the bed,

entitled <u>Busted by the Feds: A Manual for Defendants Facing Federal Prosecution</u>. He also saw piles of United States currency around the bed, as well as numerous cell phones. On the bed were a pair of cargo shorts with a large amount of United States currency sticking out of the cargo pocket. It was later determined that there was approximately $14,400 around the bed and in the cargo shorts.

12. Defendant Jones dressed, and after he was clothed, Special Agent Turner handcuffed him. At the same time, other team members accompanied the female companion as she collected her clothing. Other team members also conducted a safety sweep of the residence, checking the house for additional occupants.

13. While Defendant Jones was dressing, he asked Special Agent Turner what was going on. Special Agent Turner explained that they had a warrant for his arrest and that they would be taking him to Philadelphia, where he would be processed, handed over to the United States Marshals and arraigned by a Magistrate Judge. Special Agent Turner explained that the Government Defendant Jones would most likely be incarcerated for at least three days before his bail hearing.

14. Having noted that the bedroom next to the master bedroom was obviously that of a child, Special Agent Turner then asked Defendant Jones if he needed to make arrangements for childcare. Defendant Jones responded that his children live with their mother.

15. Special Agent Turner also asked Defendant Jones if he needed to contact an employer to let him know that he would not be coming to work. Defendant Jones replied that he did not have a job.

16. Defendant Jones had not been given his <u>Miranda</u> warnings prior to this statement.

17. Special Agent Turner did not intend for his question regarding Defendant Jones contacting his employer to elicit an incriminating response.

18. Later, when Defendant Jones was booked and processed, he was questioned for purposes of completing a standard DEA personal information form. When asked about his employment, Defendant Jones again responded that he was unemployed.

### III. Consent to Search the Mullica Hills, Residence

19. After leaving the master bedroom, Special Agent Turner then brought Defendant Jones, still handcuffed, to the dining room and seated him with other members of his team. Special Agent Turner then left the room. Defendant Jones's female companion had been brought to a separate area in the living room.

20. At some point later, Special Agent Turner returned to the dining room and asked Defendant Jones, in the presence of Special Agent Vinson, for permission to search the Mullica Hills residence. Defendant Jones expressed concern that he would not be present during the search. After Special Agent Turner explained that Defendant Jones would see and be given a receipt for all evidence confiscated and removed from the residence, Defendant Jones voluntarily and of his own free will consented to the search.

21. After searching the entire house, the agents found a suitcase and a bag in the attic containing approximately $71,000.00 in cash. Under the suitcase and bag were three greeting cards addressed to "Greg" and of a personal nature.

22. During the search, the agents also found approximately $45,000.00 in jewelry,

including Rolex and Breitling watches and a diamond necklace; about fifteen cell phones; as well as utility bills and bank statements under various names and addresses. In addition, business cards for South Street Mailbox Plus, two Enterprise locations, and the Alamo branch at the Philadelphia International Airport were found in Defendant Jones's wallet, which was in the cargo shorts on the bed.

23. Defendant Jones signed a receipt which listed all of the items confiscated from the Mullica Hills, New Jersey residence. Defendant Jones was never asked to sign a consent to search form nor did he ever do so.

## DISCUSSION

Defendant Jones claims his Fifth Amendment rights were violated when Special Agent Turner obtained his post-arrest statement of unemployment before giving Defendant Jones his Miranda warnings. Moreover, Defendant Jones claims that the search of the Mullica Hills residence was conducted without his consent and therefore, in violation of his Fourth Amendment rights. Defendant Jones now seeks to suppress his post-arrest statement of unemployment, as well as the evidence confiscated from the Mullica Hills residence on or about August 27, 2008.

### I. Post-Arrest Statement of Unemployment

In Miranda v. Arizona, the Supreme Court held that statements obtained during a custodial interrogation before a person is informed of the right to counsel and the right to remain silent are obtained in violation of the Fifth Amendment and are therefore inadmissible.[2] Yet, "the definition of interrogation can extend only to words or actions on the part of police officers that they *should*

---

[2] 384 U.S. 436, 477-79 (1966).

*have known* were reasonably likely to elicit an incriminating response."[3] Moreover, questions that inquire into "biographical data necessary to complete booking or pretrial services" are exempt from Miranda's coverage, as they fall under the "routine booking exception."[4] Still, police officers "may not ask questions, even during booking, that are designed to elicit incriminating admissions."[5]

Here, Special Agent Turner asked Defendant Jones, as a courtesy, if he needed to notify an employer that he would not be able to work for a few days. Defendant Jones could have ignored the question, or simply answered, "No." It is neither reasonably likely nor should Special Agent Turner have known that this question would elicit an incriminating response. Moreover, the Court finds Special Agent Turner credible when he testified that he did not intend his question to elicit an incriminating response. Hence, Special Agent Turner's question does not fall within the definition of "interrogation." As he was not conducting a custodial interrogation when Defendant Jones made his post-arrest statement regarding his unemployment, there is no violation of Miranda or Defendant Jones's Fifth Amendment rights.

Even if Special Agent Turner's question was part of a custodial interrogation, the question would still fall under the routine booking exception to Miranda.[6] Questions regarding employment are routine questions, "ordinarily innocent of any investigative purpose . . the sort of questions

---

[3] Rhode Island v. Innis, 446 U.S. 291, 302 (1980) (emphasis in original).

[4] United States v. Muniz, 496 U.S. 582, 601 (1990); see also United States v. Bishop, 66 F.3d 569, 571 n.2 (3d Cir. 1995).

[5] Muniz, 496 U.S. at 602 n.14.

[6] See United States v. Duarte, 160 F.3d 80, 82 (1st Cir. 1998) (holding that "employment questions fell within the exception to the Miranda rule for questioning that is designed to obtain only routine booking information.").

'normally attendant to arrest and custody.'"[7] It is noteworthy that when Defendant Jones was later processed, not only was he asked about his employment, but he once again responded that he was unemployed. Hence, Special Agent Turner was beyond the scope of Miranda's protections and thus, did not violate Defendant Jones's Fifth Amendment rights. As Defendant Jones's post-arrest statement of unemployment was obtained without violating Defendant Jones's Fifth Amendment rights, the Court will not suppress the same.

## II. Warrantless Search of Mullica Hills, New Jersey Residence

Under the Fourth Amendment, any "search without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'"[8] It is well-established "that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."[9] Here, the Court finds credible the testimony of Special Agents Turner and Vinson that Defendant Jones consented freely and voluntarily to the search of the Mullica Hills residence. Thus, Defendant Jones's rights under the Fourth Amendment were not violated by that search, and the Court will not suppress the evidence confiscated as a result of the same.[10]

---

[7] United States v. Gotchis, 803 F.2d 74, 79 (2d Cir. 1986) (quoting Innis, 446 U.S. at 301).

[8] Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)).

[9] Schneckloth, 412 U.S. at 219 (citing Davis v. United States, 328 U.S. 582, 593-94 (1946); Zap v. United States, 328 U.S. 624, 630 (1946)).

[10] The Court notes that when Special Agent Turner and other members of his team took Defendant Jones and his female companion back into the master bedroom to collect their clothing and get dressed, a number of items, including approximately $14,400 in United States currency and several cell phones, were in plain view. During oral argument, counsel for Defendant Jones conceded that because these items were in plain view, they should not be suppressed even if the Court found that Defendant Jones had not consented to the search of the Mullica Hills residence.

## CONCLUSIONS OF LAW

1. Defendant Jones was not being interrogated by Special Agent Turner when he made his post-arrest statement regarding his unemployment. Thus, Defendant Jones's Fifth Amendment rights were not violated and the Court will not suppress Defendant Jones's post-arrest statement of unemployment.

2. Special Agent Turner's question with respect to Defendant Jones's employment falls under the routine booking exception to <u>Miranda</u>. Thus, Defendant Jones's Fifth Amendment rights were not violated and the Court will not suppress Defendant Jones's post-arrest statement of unemployment.

3. Defendant Jones consented to the search of the Mullica Hills residence. Therefore, the search did not violate his Fourth Amendment rights and the physical evidence confiscated as a result of that search will not be suppressed.

An appropriate Order follows.